No, I don't think there's anything particularly sensitive anymore. I would just ask my colleague to be somewhat judicious in his discussion of confidential material. Well, I don't know doesn't give me a feeling of confidence, but I understand that the parties are prepared to waive all confidentiality with the trust that we will all be very judicious. Is that correct? That will work. Yes, ma'am. I'll try my best, ma'am. May I please, court? This is a $12 billion procurement. Where the solicitation and bid protest rules collectively failed such that the agency, the Veterans Administration, improperly eliminated a very seasoned contractor based upon the addition of an unstated evaluation criteria. And second, by comparing the DSCI, that's our client, DSCI's rates against a independent government cost estimate that was irrational and not consistent with what it stated it was going to do in the record. The error was compounded by the court below when it allowed the agency to after the fact create a record through improper testimony of counsel and the addition of documents that had been withheld by the agency for some six months up until the very eve of trial post-briefing. The principle that is at issue here is that while there's a great deal of discretion with regard to the development of evaluation criteria and with regard to the development of an IGCE, the fact is that a court needs to hold an agency to do what it says it's going to do. The principles involved are FAR 15305, which says evaluation... Are you saying that the numbers that the government came up with that it felt were realistic in terms of the amount of the labor costs were irrational? The IGCE numbers? Yes. We don't know, Your Honor. We have argued that in the briefs below that because of what they said in the assumptions, which was they were going to go parse all of the 5,000 Schedule 70 contractors, there might be an issue. But the fact was that there was no information to explain in the record how they came up with the numbers. And so we asked for that from day one for six months through the GAO proceedings and again in the Court of Federal Claims proceedings, and we're given nothing. Maybe I'm misunderstanding, and maybe we're talking about apples and oranges here, but my understanding is they came up with this appropriate cost for labor, which they thought was appropriate. And they surveyed a large number of contractors and then did a series of calculations, which got them to a 40% number of the labor cost. And then they compared your numbers to that 40% number. And you're claiming that that was irrational? That process is how it happened. But in fact, their starting point with how they started to get the numbers either was irrational and not explained in the record, or if one believes what counsel said, which we believe shouldn't have been considered, then it was inconsistent with the record. And if it's inconsistent with the record, a contractor at least has the right to know what standard it's going to be held to. That's the concern. The math, we don't know how they did the math. But it may well in fact be proper. We don't know. And that's one of the issues that was before the Court of Federal Claims and the GAO. I'm confused. You mean you don't know how they did the math? I thought they chose 10 contractors, some small business, some big business. Then they discounted, took a mean, dropped it down by 20% and then said, only if you're 50% below that are you... Yes, most of that comes from the post facto statements of counsel. If you read what the record said, the contemporaneous record, and then what the CO said, there are only 9 lines of what they said they were going to do. They said they were going to examine all of the GSA schedules and they were going to pick at random 10 contractors, which they apparently didn't do. And then they go through a mathematical exercise. And I would assume that that's what they did. The mathematical part and the numbers they end up with presumably were done correctly, although we don't know. The problem is at the beginning of the process. Well, you keep saying we don't, we're probably correct, but we don't know. Well, the standard of review is very limited here. And you've got some burden here given where we are. Absolutely. So you say, okay, they came up with certain numbers and we don't know whether they were right or wrong. Well, you've got to do better than we don't know whether they were right or wrong to prevail in this context, do you not? Your Honor, we believe that they were irrational based on their starting ground. We weren't given the record to do an analysis. We asked for it. The starting ground of what? The starting ground is page 146 of the appendix, which is the assumptions. And the assumptions say they're going to do three things, which they didn't do. One of our contentions is that an agency is supposed to follow the rules. It says it's going to set out and do it. Excuse me, 147 and 148. Very simple assumptions, what they say they're going to do. They didn't do it. They instead did something. How did they not do it? They took an average of 10 contractors, seven large business, three small business. I mean, that's what they did. With due respect, Your Honor, they did not. What they did instead of picking an average of 10 was they went and they found some list and then they handpicked 10 contractors that they liked. How does that mean it's not average? I mean, I can manually pick boom, boom, boom, boom. What evidence do you have that it wasn't random? Because they said so. No, they said they manually did it manually. Manually is not inconsistent with random. But do they had to do it on a computer with a random number generator in order for it to qualify in your mind? I don't see how that is a violation. The court below did hold that it wasn't a random process. They selected and I guess because of just basic numbers without mentioning the names, they ended up with six of the 14 largest contractors in America out of a list of 407 people. That's the universe they said they used. That's unlikely. The concern is from a contractor's perspective, if the process was done incorrectly, it could skew the process. And while our numbers were low, all we had to do was get into the bottom of that range, that very low range, and we would have been the next person. We were the next person on the totem pole to get an award. So the error range wouldn't necessarily be that big. If you start with an incorrect premise, if they had started with a random selection of 5,000 contractors, which is what they said they were going to do, their results could have been dramatically different regardless of whether the math was done correctly. Where does it say a random selection of 5,000 contractors? Labor rates are developed using 10 randomly selected contractors, seven large business. Where does it say it has to be? On page 147, labor rates are developed on a simple average of a random sampling of 10 contractors. What's left off from page 147 is GSA Schedule 7. What that originally said was that... Was that in the record? Well, it was in the record. My copy that I saw originally had that information in it. I don't know if... So on 148, does it continue from 147? Is it one... Is this like a landscape type thing that was just cut in half and produced on two different pages? I don't know, Your Honor. But it... We're not responsible for the appendix. What? So, you know, is it or is it not? I am. Is page 148 the continuation of page 147 where... because look, at the top it says scheduled 70 government site rate. Right. On 148, it said... May I just... 148. It continues to say scheduled 70 government site rates which were discounted by 20%. So the idea was on Schedule 70 where there are 5,000 contractors, that's where you start and you take a random selection which includes large and small businesses and then you make a selection from there. No, you don't... It says you have to choose 7 that are large businesses. Yes. So 7... From this universe. And did they not choose 7 of the 10 that are large businesses? Well, they didn't do it from the GSA Schedule 70. That's the point. Are these people on the GSA Schedule 70? Some are and some, I believe, are, yes. So you're saying that some of the people that they look to are not even on the GSA Schedule 70 at all? I believe that they, if you go through their 5-step analysis, they started with people who came to a show, trade show, who expressed an interest, who had the capabilities of doing Schedule 70 work, had done work like that, and were interested in doing work. Those were the 5 criteria. So our concern was that that wasn't how it started. They started with an incorrect basis and that had the ability to skew it, the results. If the numbers you start with are incorrect, then the end product can be incorrect whether the math is incorrect or not. And our concern is that the agency changed the process by which it said it was going to proceed. It used the same criteria for all potential, that all bits are correct. Yes, Your Honor. So the point is that having started incorrectly and having gone through the process and having been allowed to explain that process incorrectly or outside of what was the contemporaneous record, that should not have been allowed and that the court should have the agency go back and do the IGCE correctly in the manner that they said they were going to do it. I don't know, counsel. On page 1568 of the record, the GAO question 5 answer says that every one of the companies that was randomly selected was a Schedule 70 contract holder. And if they weren't a Schedule 70 contract holder, they were rejected and in favor of another random selection to ensure that they were complying with their IGCE assumptions. So I don't see any evidence in the record that you've produced that suggests that any of the contractors were not Schedule 70 GSA contractors. Your Honor, that was a representation of agency counsel. That wasn't the contracting officer who did it. That wasn't anybody who did it. That was agency counsel making representations and our condition is that... Counsel, the IGCE assumptions say 10 government contractors from the GSA Schedule 70. The government, in answer to these questions, says that's exactly what we did. We took 10 from the Schedule 70. In fact, we took some and if it turns out they weren't on the Schedule 70, we rejected them and picked another one. You have no evidence to the contrary. Why am I supposed to believe you're standing here saying, well, we're not sure, but some of them might not be on the Schedule 70. That's not a basis to reverse. It is a basis to reverse that the way they got there was not going to Schedule 70 and picking people. It was going to... It doesn't say they have to go to Schedule 70 and pick people. It just says that the 10 people have to come from Schedule 70. They don't have to use the Schedule 70 as a starting point. These people just have to be GSA Schedule 70. That's what 168 said. It would be a random selection from Schedule 70. A random selection of 10 contractors on GSA Schedule 70. That doesn't mean it has to start with Schedule 70 GSA contractors. It just means the 10 they choose have to be on there. I respectfully would disagree, Your Honor, but it seems to me that was where we came. The point that I would, if I may briefly address as I'm in my rebuttal time, the unstated evaluation criteria, I think we have set out clearly in our record that Section M, if you look at the pre-solicitation briefing, it was a unique circumstance that said that the agency knew how to specifically state that allocation of rates would be considered. And then in the actual solicitation, it deleted that. And a reasonable and logical contractor would have concluded that while looking at low rates would be something that would be considered, the allocation of rates between different labor categories would not. I'm going to save my time, Your Honor. Okay. I appreciate that. I hear from the government, Mr. Krafchick. Good morning, and may it please the Court. The decision of the trial court should be affirmed because the trial court did not commit an error of law in finding that the agency did not apply the unstated evaluation criteria. First and foremost, Section L in the solicitation expressly on three occasions used the terms allocation and apportionment. Then in Section M, the solicitation expressly advised all law-abroaders that they would conduct a price realism analysis of the proposed labor rates, and that's on page 586 in the Joint Appendix. So our argument, I'm sorry, Your Honor, our position is that in this case, the solicitation expressly indicated that the agency would evaluate realism as well as the allocation and apportionment of hours. Is it a problem for the government here that Section M includes the, what's reported to be the evaluation criteria, and that doesn't deal with the allocation of hours? So you have to go to another solicitation, Solicitation L, to find the references for the allocation of hours? Not at all, Your Honor, because first of all, the Section L and Section M have to be read together. In every case that an offeror submits a proposal, Section L instructs them how to assemble their proposal and tells them exactly how they're supposed to address the evaluation criteria, and the two are always read together. We realize plaintiff appellant has argued that the agency in this case anticipated offerors would have to go through, I think the term is used, a witch hunt or search throughout the entire solicitation to figure out what the agency wanted. But what plaintiff, I'm sorry, plaintiff appellant forgets in this case is that out of the 107 offerors who submitted proposals, 101 of the original offerors understood the agency's requirements. And after discussions, every single offeror but DNS consultants understood that the agency was evaluating the realism of the apportionment and allocation of hours. And frankly, Your Honor, that's the only way the agency could have evaluated, conducted a realism analysis, because the solicitation in Section M expressly advised all offerors that the way they could bid the proposal was that they had to, for each labor category, and there was 167 at government sites and at contractor sites. And the only way they could actually bid that solicitation was to meet and explain for every labor hour under every labor category. And the solicitation provided a spreadsheet, and in that spreadsheet for every labor category, there was a prescribed amount of hours. And for those hours, the protester, I'm sorry, the plaintiff or the contractors had to explain exactly how they would assign, apportion, or allocate work between each of the prime and the sub. And in this case, the prime had a significant number of subcontractors. And what they would do is once all those labor hours were multiplied by the rate, that is how they evaluated cost. The overall price was a combination of hours and labor hours multiplied by labor rates. But as the contracting officer explained, and this is at 814.29 and 1430, a simple analysis of the proposed rate, i.e. how much does it cost for a particular person, in this case we'll use the example of a data manager, that hourly rate isn't enough to understand the purpose of the solicitation of whether or not the offeror had proposed a realistic price because they had to explain clear across the board exactly how they were going to find and allocate personnel to meet all the required labor hours. Now we've got 15, we've got about 16 subcontractors. Are they required to do that, every one of them? Yes, sir. And the other thing, the other important note which the contracting officer explained to the GAO was that the solicitation expressly indicated that if an offeror wanted the price to, any price to be included in their follow-on contract if they were selected for award, they had to bid it. So in some cases, perhaps an offeror knew they could bid a data manager, say $100 an hour. However, maybe a larger report and that would be their low price and then they also would have to bid others at higher prices, but if they want that $100 an hour, if they knew, hey, we can get a break and maybe drive down our overall price by X amount of dollars, we have to bid and so the contracting officer understood all of that when she conducted her realism analysis and if she didn't do that, she would have had no way of knowing whether or not the offeror had actually proposed a realistic price and the realism analysis in this case is designed to, it's all about risk allocation. The agency was concerned that if they wanted to know that these contractors were actually going to perform at the proposed rates and more importantly, that they knew what they were doing, they understood the work and the performance work statement. So for plaintiff to argue that it was unstated is simply wrong based upon the language of the solicitation, but Your Honor, alternatively, even if we assume for a moment that solicitation section M cannot be read in conjunction with section L, it's intrinsic and as the court noted that in the language of, the court used the word terms fairly implied and plaintiff appellant attempts to make a big deal out of that, but that's effectively arguing semantics because fairly implied, intrinsic or reasonable to infer from the language of solicitation when reading it as a whole, in this case would leave any reasonable offeror. Are you talking about just reading solicitation M by itself? Yes, ma'am. If we just look at section M and say, okay, alternatively, the agency doesn't use the term allocation or apportionment which is plaintiff appellant's argument in this case and because of that, it's an unstated evaluation criteria. Well, first of all, plaintiff has not shown any law or statute of regulation supporting the proposition that an agency must explain its specific methodology for evaluating realism. So section M, if we just narrow our focus to that, expressly said we're going to evaluate the realism of your proposed labor rates and so in this case, when the, we just applied that term, because the agency didn't lock itself into a particular methodology, so long as what they do is reasonable, it should be held, it should be sustained by this court and by the trial court as well as the GAO. I appreciate this isn't in the record and I don't want to get into anything that's potentially confidential, but what's the status now? Has the contract been awarded? Oh, yes, ma'am. Is the contract in the works? Yes, ma'am. This is all publicly announced. There are 15 awards. The contract has since been performing. There are multiple rounds of protests and all the litigation has ended and the agency is off and running and they're completely transformed in their IT services, Your Honor. So this is all about damages then? No, Your Honor. Well, if the contracts have all been awarded already, what happens if they prevail? Well, we would hope they don't prevail, Your Honor. However, if the court were to remand this based upon an error of law or an abuse of discretion, we assume the court would then, depending on how it plays out, I imagine and I'm speculating, Your Honor, if this is remanded back to the trial court with direction to the trial court of what he should or should not consider. And to be clear, Your Honor, we think the trial court got this case exactly right. But for instance, if there's a... No, but what happens if this gets remanded and it turns out that you all erred? I mean, do they get the contract? I mean, you've already awarded the 15 contracts. I know, Your Honor. At that point in time, presumably the trial court would look at whatever the direction came back. I guess what would happen is the agency, at bottom, the trial court has the authority, has stopping power, so to speak. It could issue an injunction to the agency enjoining them any further performance from the 12 awardees, which would be catastrophic. I'm sorry, 15 awardees, which would be catastrophic for the agency. Well, that usually happens early on in the process, right? Yes, ma'am. And that didn't happen here. Do you know if an injunction was requested? Plaintiff sought, we believe plaintiff sought an injunction and the parties and sort of many of the other protesters, but the agency voluntarily stayed until the litigation was completed, Your Honor. So as the judge pointed out, I mean, presumably it's a damages case at this point. Well, in this case, the trial court can only award bid protest costs and perhaps attorneys fees if DNS consultants are small business and they meet the requirements under the Equal Access to Justice Act. So potentially, Your Honor, frankly, I'm not 100% certain that answers the court's questions on that issue. But you said the litigation was complete, but it's not complete. They're still going on today. Well, yes, Your Honor. I just meant litigation before the GAO and the Court of Federal Claims is when the agency agreed to voluntarily stay. But that after this point in time, based upon the issues in this case, the agency was no longer interested in voluntarily staying. And plaintiff did not seek a preliminary injunction after judgment, prior to judgment being entered by the trial court. And I don't believe they filed a motion with this court, Your Honor. Now you say the rest of the litigation that went through GAO and so forth is complete. Does that mean that you're clear that the time for appeal has expired? In other words, we're not going to see other of these related cases come up here on appeal, will we, or not? No. No, Your Honor. There are no other cases that all that time has expired. Many of those cases were resolved in the October-November time frame of 2011, Your Honor. All of them, I believe. The last case was resolved in November, filed by a couple of other contractors. I see I'm running out of time, Your Honor, and if I may briefly touch upon the discussion of the creation of the independent government cost estimate and whether or not it was sufficiently documented. Plaintiff had made a, plaintiff's counsel for plaintiff appellant had suggested that they weren't sure if none of the contractors were on the GSA schedule or if they could do the math, so to speak. The agency during the GAO process and it's been in the record since then, identified all 10 contractors, and all of their proposed rates are included in them, and all the math, so to speak, that the agency did is included in the independent government cost estimate. So plaintiff's failure to point out any critical miscalculation or any miscalculation at all in this case shows that the actual rates are, in fact, appropriate, reasonable, and a proper tool for the agency to use. They suggest that you didn't randomly choose people, ultimately, that you ended up with what, six largest companies on the entire list, and I would think bigger companies would be able to offer things cheaper, right, to drive the numbers down or something, I don't know. Presumably, Your Honor, however, the selection, as Mr. Erskine in his declaration of A1562 in the record explained, Mr. Erskine was the source selection evaluation board chairman. As he explained to the GAO, the selection, as the court noted earlier, was a manual random selection of contractors, and they, off a list of 407 interested contractors that attended industry day, and when, as their criteria consistent with the assumptions were that the contractors be on schedule because the labor, many of the labor categories track with what has already been deemed fair and reasonable on the GSA schedule, and Part 8 notes that any price on schedule is considered fair and reasonable, so the agency used that as a starting point, but at the trial court, the judge asked, was it purely random, was it like, did they pick names out of a hat, and the response was, no, it depends on how you define random, Your Honor, they weren't picked out of a hat. They were selected from a list of 407 contractors who attended industry day, and that's what drove the list, so to speak, but there is no irrational assumption or critical miscalculation, as the plaintiff has pointed out. How were they selected, it depends on how you define random, well, how do you define random such that this selection was random? In this case, they define random, Your Honor, by first, who showed an interest, who showed up at the industry day list, then, who, from that list and from in attendance, was on schedule, and who, because being on schedule means that they had a history of providing work that tracked with the 167 labor categories, and so that random selection, although they used the term random, what they were really doing was trying to pull off their best estimate of contractors who knew the work, who understood the work, who had a history of pricing it, and where they could simply look at the prices, come up with an average, discount it by 20%, and then use it in a comparative assessment against each of the proposals that came in, and that comparative assessment happened. Plaintiff's appellant counsel continues to argue that everything in there, and that all the explanation came from counsel, but as we pointed out in our papers, agency counsel repeatedly cited back to the contracting officer's statement and other documents that were contemporaneous and in the record before the GAO, and additionally, Your Honor, in our papers, we argued that there was no one fair surprise. All the documents that were eventually put in the record were publicly available on the day they were created, and this could all be independently verified and viewed, and plaintiff's appellant DNS consultants attended the pre-solicitation conference, pulled down the solicitation from the very website where all these documents were located. So there's no question that they knew or should have known of the existence of all these various documents. When the matter was filed at the Court of Federal Claims, and we initially filed the administrative record, it was over 85,000 pages, and counsel for plaintiff's appellant was involved in that conversation of what should be and what should not be, and it's the usual practice in a bid protest. We want to provide a fulsome record of everything that was or should have been considered by the decision who made it, I'm sorry, by the person who made the decision under challenge. However, the trial courts typically say, I see I'm running out of time, typically say that if you can agree to it, great, we don't need to worry about supplementation or any other arguments. And so there was a conversation, and counsel knew all about this. Finally, the issue I'd like to turn to is prejudice in this case. Concerning the unfitted evaluation criteria argument that we've seen from plaintiff's appellant, plaintiff's appellant's argument is, you said, you didn't tell us in section M you were going to use allocation of hours, you didn't do that in this case, and because of that, your entire independent government cost estimate is irrational. Well, the point they missed there, Your Honor, though, is that there's a multiple, and there are multiple iterations in the record where the very, if we just limit our evaluation, I'm sorry, our consideration to their rates themselves, the plaintiff would have us do it, there are multiple times, and at, you know, JA 1278, where the plaintiff's own rates, and they, for a total of 66.5% of the hours, and there's, there were approximately 20,400 rates, and thousands upon thousands, if not millions of hours, but 66.5% of their hours were below the 60% mark that was used as the benchmark to determine whether or not the rates were realistic. For example, plaintiff had proposed for the data management requirement, their own price was $135.32 per hour. They're, one of their. I don't think I understand what point you're arguing. Prejudice, Your Honor, I'm sorry, I got a little sidetracked. Is this the standing point, that you're trying to say they don't have standing? Oh, no, Your Honor. What is the prejudice? Prejudice, well, there are two types of prejudice, Your Honor, prejudice for standing, prejudice on merits. We cited LAVAT food services for the support, and I see I'm getting really close to my time. We cited LAVAT food services, which is a standing case, but to support the proposition that because plaintiff cannot demonstrate any disparate treatment in this case, they can't show prejudice, because the agency uniformly applied the unstated evaluation criteria. However, if we wish to turn to the merits in this case, the, any number of their rates, and every single one of them was highlighted in the item for negotiation sent to the plaintiff's office, they still can't show prejudice, because the very rates they proposed, if we completely take allocation of hours out of the equation, the very rates themselves were unrealistic, and in fact, not only were they unrealistic, they were unrealistic if you look simply at their proposal. In certain instances, in multiple instances, they proposed a rate of $135 for themselves as a prime, and then they'd have any number of their subcontractors with a rate of $35. I think the number was, just to be certain, Your Honor, the numbers were 3157 for one of their subcontractors, when they as the prime submitted a $135 per hour rate. On its face, any reasonable person would look at that and say, that's unrealistic. How could you have somebody performing at a quarter of your own proposed rate? Forget it, if we completely take the independent government cost out of the equation, on its face, their proposal is still unrealistic. They were still the low-priced offeror by over a billion dollars, and similarly situated offerors who were similarly priced were also found, were also removed from the competition for various reasons. But finally, the final point on prejudice in this case is, any prejudice that might have occurred to them on the unstated evaluation criteria has to be ameliorated, because the agency sent them an item for negotiation, which they haven't challenged on appeal, as being a meaningful discussion question, and said, it appears you've proposed unrealistic rates. Please explain to us how you can meet the requirements of the performance work statement. And their response, they didn't say, well, we're going to increase our rate to reallocate. They said, no, no, we have great benefits. And they said, well, we can actually perform. I know you can't talk any faster. So why don't you just wind it up with this? Yes, ma'am, I'm sorry. For these reasons, yes, thank you. Yes, I look forward to affirming the trial court's decision. Thank you very much. Since the government ran over about a minute, we'll give you the next minute for rebuttal. I'll try to be brief, Your Honor. The final two minutes of the government's argument, I do not believe, were briefed at all, and they're extraneous to it. I want to touch on the unstated evaluation criteria. The court itself said there's no explicit instruction in the solicitation that there was going to be an evaluation of allocation of hours. The immediate preceding document before the solicitation was issued explicitly stated in Section M in one of the two technical areas, sample task orders and management approach, that the government was going to consider allocation of hours. That would alert this contractor that in that draft that the government knew how to state when they were going to look at allocation of hours if they were going to. When you get to the actual solicitation, that language disappears. And so what you have is a contractor who reasonably would conclude that the government knew how to put it in, they took it out, and it wasn't there when they started the proposal. Do you agree that the government's going to be, that it's fair under the proposal that the government will be looking at the price per hour? Absolutely, it'd be fair to look at the price. So, and you agree that the government said the price has to be, the ultimate price has to be realistic. Yes, Your Honor. Okay, well, the ultimate price is simply number of hours times cost per hour. Absolutely. So it would be absurd to say if the ultimate price has to be realistic, and one variable has to be realistic, the other variable is free to be as unrealistic as possible. It can't equal a realistic price. Yes, it is, because you look at the total price, and that's what they said they were going to do. They were, if you look at Section M, it says we're going to look at your rates and your price to see if they're so low as to be unrealistic. You can do that analysis. It's done. What you can't do is then say we're going to parse it on your allocation, because allocation in this case, our contractor went and proposed something as a low-cost approach, something it's done before. If you tell someone that allocation of hours is going to be a factor, then you may, your strategy for how you bid the project will be different. And the way to point this out that other contractors who were similarly situated had the same reaction as us, in the IFNs, we received an IFN that said you have lots of low rates. Come up with a plan to show how you're going to deal with it. Our plan was to go back and ask our subcontractors, how are you going to deal with it? Are your prices good? And they said they're good, and we stayed with it. The other people did one different thing. They all raised their price. Nobody changed their allocation of hours, and only one of them even made mention that they might change their allocation of hours. So the understanding of the other contractors.